George KRULL and Michael Krull, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15997.

United States Court of Appeals Fifth Circuit.

Jan. 4, 1957.

Writ of Certiorari Denied March 25, 1957.

See 77 S.Ct. 674.

---

3. This trial resulted in a hung jury.

Clinton J. Morgan, Oscar M. Smith, James S. Kilpatrick, Rome, Ga., for appellants.

J. Robert Sparks, Asst. U. S. Atty., Atlanta, Ga., James W. Dorsey, U. S. Atty., Atlanta, Ga., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The appellants, George Krull and Michael Krull, were charged in a single indictment with these offenses:

(a) By Count 1, both defendants were charged with the kidnapping and transportation from Tennessee into Georgia of the female victim, named in the indictment, in violation of 18 U.S. C.A. § 1201;

(b) By Count 2, Michael Krull was charged with committing rape upon, and George Krull was charged with aiding and abetting Michael in raping of the named victim in the Chickamauga and Chattanooga National Military Park, alleged to be under the exclusive jurisdiction of the United States, in violation of 18 U.S.C.A. § 2031;

(c) By Count 3, George Krull was charged with committing rape, and Michael Krull was charged with aiding and abetting George in the rape of the same victim in the Chickamauga and Chattanooga National Military Park, alleged to be under the exclusive jurisdiction of the United States, in violation of 18 U.S.C.A. § 2031; and

(d) By Count 5, the defendants were jointly charged with the interstate transportation of a stolen automobile in violation of the Dyer Act, 18 U.S.C.A. § 2312.

The appellants were found guilty of the offenses of which they were accused by the indictment. For the conviction under Count 1 of the indictment they were sentenced to life imprisonment; for the conviction of the charge of Count 2 they were sentenced to death; the same penalty was imposed upon the conviction of the Count 3 charges; and for the conviction under Count 5, each defendant was sentenced to five years imprisonment. Counsel for the appellants, ably representing them by court appointment in a cause distasteful in many of its sordid aspects, have appealed from the convictions and sentences. We shall make no more references to the revolting evidentiary details disclosed by the record than is required properly to dispose of the questions which we are called upon to decide.

Counsel for Michael Krull who represented him at his trial and on this appeal were appointed on September 12,

1955. They conferred with him while he was confined in a prison known as the Fulton Tower. Thereafter Michael Krull was removed to the Federal Penitentiary at Atlanta for the assigned reason of an attempted escape. Of this removal the counsel for Michael were told by the United States Attorney who advised that counsel could see their client at the penitentiary and if anything was not satisfactory in regard to interviewing their client to let him, the United States Attorney, know. The case was set for trial and the trial commenced on Monday, January 30, 1956. Five days before this date, on Wednesday, January 25, 1956, counsel for Michael went to the penitentiary for an interview with him. He was brought to them in a room about twelve feet wide and twenty feet long. The appellant, Michael Krull, and his counsel conferred at a table at one end of the room while at the other end of the room, seated at a table and facing them, was a Federal Correctional Officer. Counsel asked the officer to leave and he replied that his orders required him to stay. Counsel talked in a low tone to Michael for forty-five minutes to an hour. They asked their client all of the questions they would have asked if the officer had not been in the room. They stated that they believed the officer could have overheard them. No report of the interview or anything there said was made to the United States Attorney or to any of his assistants. Counsel for Michael made no request of the warden or other supervisory official at the penitentiary for a private conference with their client; they made no complaint to the United States Attorney who had requested that he be told if anything was not satisfactory with respect to interviewing their client. At the trial one of counsel for Michael said that he felt the matter was not in the purview of the United States Attorney. Counsel made no application to the Court or to the Judge for an order providing for a private interview. Counsel stated that he thought he "had gone as far as the law required him to go". When the case was called for trial, counsel for Michael moved on his behalf for a continuance, asserting that the presence of the officer in the room and the refusal of the officer to leave when so requested denied or deprived Michael Krull of the right to counsel guaranteed to him by the Sixth Amendment to the Constitution of the United States. The motion was denied and the ruling is assigned as error.

■ The right which the appellant, Michael Krull, seeks to invoke is one of those which are guaranteed by the Bill of Rights. "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense". U.S.Const. Amend. VI. The aid of counsel in consultation, investigation and preparation for trial in a criminal case is as necessary as the presence and participation of counsel at the trial itself. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; House v. Mayo, 324 U.S. 42, 65 S.Ct. 617, 89 L.Ed. 739; Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 166, 90 L.Ed. 61; United States v. Venuto, 3 Cir., 1950, 182 F.2d 519; Thomas v. District of Columbia, 1937, 67 U.S.App.D.C. 179, 90 F.2d 424; Shapiro v. United States, 1947, 69 F.Supp. 205, 107 Ct.Cl. 650; McDonald v. Hudspeth, D.C.Kan., 41 F.Supp. 182.

■ The prosecution is not entitled to have a representative present at a conference between an accused and his counsel to overhear their conversation. Coplon v. United States, 1951, 89 U.S.App. D.C. 103, 191 F.2d 749, certiorari denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690; Caldwell v. United States, D.C.Cir., 1953, 205 F.2d 879; United States ex rel. Cooper v. Denno, 2 Cir., 1955, 221 F.2d 626, certiorari denied 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, certiorari denied 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774.

■■ The right of an accused to consult his attorney in private is not one without some limitations. It was held by this Court, in a case where an accused

had been denied the right to confer with his counsel during the evening of the first day of the trial, that:

> "No showing is made that appellant was not permitted to consult with his counsel sufficiently to prepare his defense, and reasonable restrictions may be imposed as to the time and place of consultation between an accused and his attorney without infringing constitutional rights." Altmayer v. Sanford, 5 Cir., 1945, 148 F.2d 161, 162.

It is here shown by the statement of counsel for Michael Krull that he was asked all of the questions which would have been asked of him had there been no one in the room with them. Whatever the officer may have overheard, if anything, was not communicated to the Government prosecutors. It did not appear that the defense of the accused was in any way hampered or prejudiced. The need for conferring in a low voice may have been an inconvenience but it did not infringe any constitutional right.

The interview between Michael Krull and his counsel was on a Wednesday, with four intervening days before the date of the trial on the following Monday. Had privacy been sought by a request to the prison warden, or had the United States Attorney been asked to have arrangements made for a conference with the guard absent, or had an application been made to the trial court, it may be assumed that facilities for a conference would have been provided without anyone present but the accused and his counsel. Counsel for the defendant, Michael Krull, stated to the court that "I thought that since the warden had notified me that I would be able to see him, and believing at that time that it was a constitutional right of my defendant to be counseled with in private, I thought that I had gone as far as the law required me to go." This statement was made in response to a reminder by the United States Attorney of his statement to counsel for Michael Krull that if anything about interviewing the accused at the penitentiary was not satisfactory to

let him (the United States Attorney) know. Thus it appears that the hope of preserving a point for appeal was more important to defense counsel than a private interview with his client. Ample opportunity existed for asking for a private consultation. The request should have been made if a private interview was believed to be necessary or desirable. There was no error in refusing to grant a continuance or to grant a new trial on the ground that Michael Krull had been denied the effective right of counsel.

Counts 2 and 3 stated that the offenses there charged were committed in Chickamauga and Chattanooga National Park, a place under the exclusive jurisdiction of the United States. The statute, 18 U.S.C.A. § 2031, makes rape a crime under Federal law when committed "within the special maritime and territorial jurisdiction of the United States". It became necessary, therefore, not only to prove that the offenses charged by these two counts were committed, but also to establish the situs where committed and show that such situs was within the jurisdiction of the United States. Much of the time consumed by the Government in making out its case was spent in the presenting of testimony and documentary evidence offered for the purpose of showing that the United States had jurisdiction over the park, demonstrating to the extent material the boundaries of the park, and proving that the offenses of rape were committed within its confines. There are some specifications of error assigned by each of the appellants, raising in different form the same questions of law. Some specifications are raised by one of the appellants but not by the other. Except as material to a consideration of a particular point, we will not concern ourselves with which, if only one, of the appellants presented the question.

 It is asserted that the evidence was insufficient to show that the offenses of rape were committed within the territorial jurisdiction of the United States because, it is said, the Park never came into existence as such. The Act of Con-

gress enacted for the purpose of establishing the Park, provided:

"That upon the ceding of jurisdiction by the legislature of the State of Georgia, and the report of the Attorney General of the United States that a perfect title has been secured * * * the lands and roads embraced * * * are hereby declared to be a national park," Act Aug. 19, 1890, 26 Stat. 333, 334, § 2.

In the brief of one of the appellants it is contended that, since no one apparently knows whether or not the Attorney General made a report that a perfect title had been secured, the jurisdiction of the United States over the area has not been proved and, it would seem, cannot be proved without a further Act of the Congress. The Administrative Officer of the Park had lived within its boundaries for twenty-eight years during all of which he was a park employee of the United States. He testified as to the possession and control of the area by the United States. The right of the United States to exercise jurisdiction after so long a time cannot be defeated or diminished by the absence of proof that the Attorney General approved the title. We do not think the giving of the title report is a condition precedent to the vesting of jurisdiction in the United States. If there be such a requirement, it will be presumed, after the lapse of such a long period of time during which the United States has exercised a de facto jurisdiction over the area, that the report was made. 20 Am.Jur. 174, Evidence, §§ 170, 172.

■■ The United States introduced in evidence a map, U. S. Exhibit 1, showing the boundaries of the Park. It was identified by a supervising draftsman of the Army Corps of Engineers as an official map. The Government introduced another map of the Park, U. S. Exhibit 3, which was taken from the files of the Park and it was a part of the official Park records. The Government introduced a book entitled United States Military Reservations, U. S. Exhibit 4, showing the location and containing a description of the Park and a title history of the various tracts comprising it. The book was authenticated by a War Department Certificate and the Seal of the Secretary of War. To the admission of these exhibits in evidence objections were made and error is assigned to the Court's rulings in admitting them. The maps were admitted, not to show title as appellants assume, but to show boundaries and to establish the location of the place over which the jurisdiction of the United States was exercised so as to show that the offenses were committed within the jurisdiction of the United States. The book, so the appellants assert, is hearsay and no less so than it would have been without an official seal.

The Judicial Code makes provision for the introduction of business records and Government records and papers. Its provisions are:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind.

"Government records and papers; copies

"(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.

"(b) Properly authenticated copies or transcripts of any books, records, papers or documents of any department or agency of the United States shall be admitted in evidence equally with the originals thereof." 28 U.S.C.A. §§ 1732, 1733.

The evidence admitted is of the kind contemplated by the Code.

In their presentation of the Government's case it was apparent that the United States attorneys were anxious to produce everything that might be required to establish venue. They had before them and followed the opinion of Mr. Justice Holmes who, in disposing of like objections to evidence similar to that we consider here, said:

"Several objections were taken to the admission and sufficiency of evidence. The first is merely an attempt to raise technical difficulties about a fact which no one really doubts; namely, that the band barracks, the undisputed place of the crime, were within the exclusive jurisdiction of the United States. A witness testified that they were within the inclosure of Fort Worden, under military guard and control, from which all unauthorized persons are excluded, and that he knew that the fence was coincident with the boundaries shown on a map objected to but admitted. He identified the band barracks as described in certain condemnation proceedings. The State of Washington had assented by statute to such proceedings and Congress had authorized them. The deeds and condemnation proceedings under which the United States claimed title were introduced. The witness relied in part upon the correctness of official maps in the Engineers' Department made from original surveys under the authority of the War Department, but not within his personal knowledge, and he referred to a book showing the titles to Fort Worden compiled under the same authority. The documents referred to are not before us, but they properly were introduced, and, so far as we can see justified the finding of the jury, even if the evidence of the de facto exercise of exclusive jurisdiction was not enough, or if the United States was called on to try title in a murder case." Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 6, 54 L.Ed. 1021.

The rule as announced in the Holt decision is applicable here. The doctrine of the Holt case was followed and applied by this Court in a murder case. From the opinion we quote:

"The plaintiff in error also assigns error based upon the action of the District Court in permitting certain deeds and other muniments of title to go to the jury without proper proof of their execution. The United States was in possession, through contractors, engaged in excavating for a post office, of the land where the murder was committed when it was committed. The defendant himself was a contractor under the government, and claims to have been rightfully on the premises, when he killed Hermes, by virtue of that relation to the government. The witness orally described the place of the killing as the post office site. In this state of the record, the government was not required to prove its title, as in an action of trespass, and the introduction of the deeds and title documents could not have injured the defendant, whether technically proven or not." Brown v. United States, 5 Cir., 1919, 257 F. 46, 51.

It probably would be enough, for the purpose of dispelling any doubt as to the jurisdiction of the United States over the Park, to refer to the express determina-

tion of the question by the Supreme Court of the United States. The holding is:

"The administration of the Park was placed with the War Department, and it appears from its files that on July 14, 1930, upon a review of the pertinent legislation, the Judge Advocate General gave an opinion that the Act of 1927 'vests exclusive jurisdiction in the United States over that part of the Chickamauga and Chattanooga National Military Park located within the State of Georgia' and that violations of law occurring on the ceded lands are enforceable only by the proper authorities of the United States. As this administrative construction is a permissible one we find it persuasive and we think that the debated question of jurisdiction should be settled by construing the Act of 1927 in the same way." Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 447, 83 L.Ed. 455.

In a recent case this court affirmed a conviction where the appeal was on the single ground that the United States failed to prove that the offense was committed within the "special territorial jurisdiction of the United States." There it was said:

"We think it quite clear that the assignment is without merit. Putting to one side the decision of this court in Brown v. United States, 5 Cir., 257 F. 46, that if, as was the case here, the place where the offense was committed was sufficiently described, the court will take judicial notice of facts which vest the United States with jurisdiction, the record overwhelmingly, indeed conclusively, establishes the jurisdictional facts." Hudspeth v. United States, 5 Cir., 1955, 223 F.2d 848.

There was no failure of the United States to show its jurisdiction over the Park.

Park employees were called as witnesses for the United States. Objection was made to their parol testimony as to the location of monuments and boundaries. Objection was made that, to the extent such testimony was given with reference to a map, the testimony was hearsay and should have been excluded. The testimony was properly received. It did not appear that there was any question as to the location of the boundaries. On the contrary they seemed to have been well established. The question was not one as to a disputed boundary but whether an offense was committed within or without the boundary. Oral testimony is admissible as to monuments and boundaries, particularly as to property of a public nature. Boardman v. Reed & Ford's Lessees, 6 Pet. 327, 31 U.S. 327, 8 L.Ed. 415; Clark Surveying and Boundaries 421, § 413.

One of the witnesses located the situs of one of the offenses as being within Land Lot No. 134 and stated that he could testify as to its boundaries both by reference to one of the maps introduced in evidence and independent of any map. The United States introduced in evidence the court files and records in the condemnation proceedings whereby title was sought to be acquired to Land Lot No. 134. The condemnation papers showed that funds were deposited in the registry of the court for payment to the former owner whose land was being taken. Because it is not affirmatively shown that the former owner received the award, it is urged that there was no proof that title was acquired and error was committed in admitting the evidence. The right of the appellants to raise the point is doubtful, but whether so or not, there is no merit in it. It cannot be supposed that an owner of property could defeat condemnation by declining to withdraw funds deposited in the registry of a court. The duty of the United States to make payment to the owner was discharged by the payment into court. United States v. Dunnington, 146 U.S. 338, 13 S.Ct. 79, 36 L.Ed. 996; United States v. 412.715 Acres of Land, D.C. N.D.Cal.1945, 60 F.Supp. 576; Brazos River Conservation and Reclamation Dis-

trict v. Costello, 135 Tex. 307, 143 S.W.2d 577, 130 A.L.R. 1220.

Prior to the 1948 revision of Title 18 of the United States Code, the pertinent statutes dealing with the penalties for the crime of rape were as follows:

"Whoever shall commit the crime of rape shall suffer death." 18 U.S. C. (1946 Ed.) § 457.

"In all cases where the accused is found guilty of the crime of murder in the first degree, or rape, the jury may qualify their verdict by adding thereto 'without capital punishment'; and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment for life." 18 U.S.C. (1946 Ed.) § 567.

In the 1948 enactment these provisions were rewritten and now read:

"Whoever, within the special maritime and territorial jurisdiction of the United States, commits rape shall suffer death, or imprisonment for any term of years or for life." 18 U.S.C.A. § 2031.

"Within the special maritime and territorial jurisdiction of the United States,

"Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life;" 18 U.S.C.A. § 1111.

Under the criminal code as it existed before the 1948 revision, the punishment for murder in the first degree was prescribed in these words:

"Every person guilty of murder in the first degree shall suffer death. Every person guilty of murder in the second degree shall be imprisoned not less than ten years and may be imprisoned for life." 18 U.S.C. (1946 Ed.) § 454.

The penalty for transporting in interstate commerce a kidnapped person was fixed by the prior statutes in this manner:

"Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully * * * kidnaped, * * * shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine." 18 U.S.C. (1946 Ed.) § 408a.

The new provision is:

"Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." 18 U.S.C.A. § 1201.

At the trial the United States Attorney took the position that the change in the statute did no more than permit a sentence for a term of years as well as the penalty of death or life imprisonment for which the former act provided. The Government's view was that the jury, if it agreed upon guilt, should fix the punishment at death or imprisonment; and if it was fixed for imprisonment it then became the function of the court to fix the term, either for a number of years or for life. For Michael Krull it was urged before the District Court that in the event of a guilty verdict the jury was

vested with full and complete discretion as to the penalty whether death, life imprisonment, or imprisonment for a term of years. It was contended by George Krull before the District Court that the jury had no prerogative as to the rape counts except to return a verdict of guilty or not guilty. Confronted by this trilemma, the court charged:

"There has been prepared for your verdict a form here which reads as follows: 'We, the jury, find the defendant Michael Krull', and then follows a blank space, followed by the language 'on count 1 [kidnapping]', 'and fixes punishment by', and then follows another blank. If you find the defendant Michael Krull guilty under Count 1, you would write the word 'guilty' in such a blank, and following the words, 'and fixes punishment by', you would fill that in by putting in there the word 'death', if you fix his punishment by death, or you would write in there after the word 'punishment by', the words 'life imprisonment'. If you do not write anything after the words 'punishment by', it would be the duty of the court to fix the term of imprisonment of Michael Krull within the minimum and maximum limit as provided by law. Likewise there follows immediately after the foregoing, the language, 'And we find the defendant, George Krull', followed by two blanks, and in the same way you would put in the first blank the word 'guilty' or 'not guilty'. In the second blank you would put 'punishment by death' or 'punishment by life imprisonment' or punishment by neither, leaving that blank. This is the same type of verdict as to Michael Krull and George Krull on Count 2 [Rape by Michael Krull], and on Count 3 [Rape by George Krull], and also on Count 5, except that in connection with the sentence 'or punishment' under Count 5, which is theft of the automobile, you will not be concerned one way or another with the punishment in that case, but that punishment would have to be fixed by the Court, and in the Court's own discretion within the limits as fixed by law."

George Krull excepted to the charge. The jury returned a verdict of guilty against both defendants with the penalty of life imprisonment on the kidnapping count and the penalty of death on the rape counts inserted in their verdict. The Court sentenced both of the appellants to life imprisonment on the kidnapping count and to death on the rape counts. In the portion of the sentences of Michael Krull, it was said:

"The jury having found the said Michael Krull guilty of the offense of rape under Count Two and under Count Three of said indictment, without any recommendation for a life sentence, but having fixed the penalty at death, it is ordered and adjudged that said defendant shall suffer the punishment of death * * * ".

A like sentence in the same language was imposed upon George Krull. On the day of imposing the sentences the Court entered an order which, omitting formal parts, is as follows:

"Counsel for the defendants in this case have taken the position that under the present status of the law fixing the various penalties for the crime of rape, it is entirely within the discretion of the court as to whether upon a conviction, a defendant should be given death by electrocution or be given a life sentence, or sentence to a term of years.

"In the above stated cases this court in its charge to the jury directed the jury that they should if they found the defendants guilty, prescribe punishment either by death penalty or by life sentence, and, if they desired to fix punishment less than life sentence, that punishment be left to the Court.

"The jury did either fix as a matter of law, or did recommend the

death penalty as to both defendants on each of two Counts.

"For purposes of this sentence the Court is treating the death penalty as imposed by the jury as only a recommendation and the Court will impose the death penalty upon the theory that the jury merely recommended and did not fix as a matter of law, the death penalty.

"Even should it be considered that the jury did fix the death penalty as a matter of law, it would nevertheless be the duty of this Court to either approve or disapprove that verdict, and if this Court should feel that in this case a death penalty should not be imposed, it would be the duty of the Court in some manner authorized by law to remove the death penalty.

"This Court in imposing the death penalty is doing so both on account of the fact it was imposed by the jury and on account of the fact that the Court in its own discretion is of the opinion, under the facts in this case, that such a penalty is authorized under the law and the evidence in the case, and sentence will be so entered."

While not complaining of the verdicts and sentences on the kidnapping and Dyer Act charges, both of the appellants now assert that it was error to charge the jury that it should fix the penalty upon conviction of rape and, even though the verdict be treated as a recommendation only it was or might have been the basis for the imposition of the death penalty. The position of the Government was pretty well stated for it by the Court in a discussion with counsel after the verdict but before the sentence. The Court commented:

"Well, gentlemen, if I should rule that the recommendation of the jury is not binding upon the court, and treat it as surplusage, then it would be up to the court to impose a punishment, and if I should impose the same punishment that the jury imposed, then it would seem that there wouldn't be any question. I don't mean by that that the court should do that, just in order to avoid any question, because I don't think that is correct. I think if the court does not approve the verdict of the jury, regardless of what the statute is, that he should not let it stand.

\* \* \* \* \* \*

"Well, now, let's look at it this way: Of course if the court influences a jury improperly that is reversible error. On the other hand, if I should rule this is surplusage, then the question is whether the court is being influenced by the jury. I'll say that is not the real question, and I'll illustrate it in this way, that this court and every other court has frequently had a jury to find the extreme death penalty, which in the court's discretion the court has set aside. I could cite you to any number of cases where I have been confronted by the proposition, and the jury gave the electric chair, and I felt it was severe and set it aside. I could cite any number of cases to that effect, which means there is no presumption of law that because the jury recommended a death penalty, and should not have done it, that the court, if he elected to give the death penalty was unduly influenced by the jury's recommendation, and so I think the way I'll handle this matter is to hear from counsel as to whether they think the punishment should be just as though the jury had nothing to do with it."

 In the absence of a statute the jury has the responsibility of determining whether the accused in a criminal case is guilty or not guilty; and upon the court rests the duty of fixing the punishment. Glover v. United States, 8 Cir., 1906, 147 F. 426, 8 Ann.Cas. 1184. If the jury, without statutory authority, makes a recommendation for clemency, it does not invalidate the verdict and may be disregarded by the court in imposing sentence. Thlinket Packing Co. v. Unit-

**134**

ed States, 9 Cir., 1916, 236 F. 109, 149 C.C.A. 319; 23 C.J.S., Criminal Law, § 1407, p. 1100. Under the statute as it existed before the revision 18 U.S.C. (1946 Ed.) § 567, the question as to whether a person convicted of murder or rape should be capitally punished was committed by Congress to the discretion of the jury and to the jury alone. Winston v. United States, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456; Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055. In the 1948 revision the provisions for the punishment of murder in the first degree were carried forward without change of substance, as was the provision for the punishment for kidnapping. If it had been intended that the jury should continue to have any part in the determination of the penalty to be imposed upon a conviction for rape the Congress, by language used, would have assigned to the jury either a direction to fix the penalty or a discretion to make a recommendation to the court. The section of the new criminal code, 18 U.S.C.A. § 2031, indicates that Congress regarded that a sentence of life imprisonment, as well as the death penalty, might be too severe and so provided that imprisonment might be for a term of years. Lovely v. United States, 4 Cir., 1949, 175 F.2d 312. In so doing it omitted any reference to the qualification by the jury of its verdict of guilty. The intent, we think, of Congress was to leave with the court the sole penalty-fixing power, within the statutory limits, for rape committed within the territorial jurisdiction of the United States.

 The district court was in doubt as to whether the power to fix the penalty rested with it or with the jury. It concluded, erroneously we hold, that if the jury did fix the penalty rather than merely recommend, the court could remove the death penalty. The court imposed the death penalty "both on account of the fact that it was imposed by the jury and on account of the fact that the court in its own discretion is of the opinion, under the facts in this case, that such a penalty is authorized * * * ".

We think those portions of the jury's verdicts by which it purported to impose death penalties for the rape convictions should be treated as surplusage, and that the verdict should stand as a finding of the guilt of both defendants under each of the two counts charging rape. We so treat it. It cannot be said that the district court so treated it.

 We are not confronted with a question as to whether the court should give consideration, in determining a sentence, to a recommendation by a jury of mercy or leniency where not authorized by statute. See 23 C.J.S., Criminal Law, § 1407, p. 1100. The humanitarian spirit which has animated the Congress in authorizing less drastic penalties would seem to preclude the court from giving any effect to a recommendation of the death penalty, the most severe of all penalties. See Andres v. United States, supra. The district court thought possibly the jury verdict death penalty provisions were valid; or if not valid the court would impose the death penalty upon the theory that the jury only recommended it; and the court imposed the death penalty both because imposed by the jury and because the court in its own discretion was of the opinion that such a penalty was authorized. The death penalty should have been imposed if, and only if the court in its discretion was of the opinion that such a penalty was proper without any regard for or giving any effect to that portion of the jury's verdict relating to and purporting to fix the penalties on the rape counts. The sentence on these counts will be reversed and set aside so that the appellants may again be sentenced on these counts in like manner as in other cases where verdicts of guilty, without more, are returned.

The appellants urge that there should be a new trial rather than a remand for re-sentencing because, they say, it would be impossible for the court to put out of mind and not be influenced by the fact that the jury had agreed upon the death penalty while believing it was empowered to do so. We do not agree. Objectivity of approach and ability to reject

the irrelevant and immaterial in the making of decisions are inherent in most judicial activity. There is no reason to suppose that this case will be an exception. The remanding of the cause for resentence is the appropriate means for the correction of the error. People of Virgin Islands v. Price, 3 Cir., 1950, 181 F.2d 394.

 We think the instruction of the Court that the jury could, if it found the defendants guilty, fix the sentence at death or life imprisonment, or leave to the Court the fixing of the term of imprisonment, was erroneous. Our reasons for this view have been heretofore given. It does not follow that the error requires a new trial. Before there could be any penalty, whether of death, imprisonment for life, or for a term of years, a finding of guilt was required. No tendency to convict would result from the mistaken belief of the jury that it had the sentencing power. The appellants were not prejudiced by the error. A reversal is not required.

The case was given to the jury at 3:55 on the afternoon of February 3, 1956. Between nine and ten o'clock that evening the foreman of the jury requested the marshal to inquire of the Court if they might ask and be informed as to whether, if the defendants were sentenced to life imprisonment it would ever be possible for them to be paroled, and whether there was a minimum time that must be served before parole could be granted. After ascertaining the views of counsel by telephone the Court instructed the marshal to advise the jury that the questions could not be answered. The marshal did so. Later in the evening the jury was recalled to the court room. The Court invited inquiry as to any questions which could be answered. Then occurred the following colloquy:

"The Foreman: Judge, Your Honor, are we permitted to ask any questions that we desire regarding this case?

"The Court: You may ask them, but there are some questions which it would not be proper for me to answer, but do not hesitate to ask them, any that you would like.

"The Foreman: Any questions that I might ask would not interfere with the case, it would be the answer that you give, is that correct?

"The Court: Yes, sir.

"The Foreman: If a person is given a life sentence in a case similar to the one that we are deliberating on, would it be possible at any future time, or is there a certain number of years that he has to serve before he can ask for a parole, and is it possible for a life sentence of this kind to ever be paroled? Now, can that be cleared up in the minds of the jurors? In other words, if a life sentence is rendered, does it mean that there is no possible way for this man to be released at any future time, and that he will be forever confined in prison? Now, those are the questions that we would like to have cleared up.

"The Court: The matter of parole is under a different department of the Government, something over which the Courts have no jurisdiction whatsoever, and what might or might not happen in that regard is something that the Court would just not be able to state. I just would be unable to state what might or might not be done in that regard.

"The Foreman: Your Honor, is there a stipulation of time that a person must serve at which time he can ask for a parole?

"The Court: Could counsel give this court the benefit of their views on that?

"Mr. Sparks: May it please the court, we don't think that we should discuss that matter in front of the jury. Counsel for its defense and the prosecution agree on that, isn't that correct?

"Mr. Smith: Yes.

"The Court: Suppose you ask any other questions, Mr. Foreman, if

you have them, and let the jury retire and I would like to consult with counsel on this matter before I give you an answer.

"Mr. Foreman: I might state that that is the major questions that exist at this time, Your Honor, whether there is a possibility of a person receiving a life sentence and not being able to be released at any time in the future, or if there is a law existing whereby he might serve a number of years and then be permitted to seek a parole, or if there is a law which sets a certain time on a life sentence that he can be released on. I think that covers practically every question that we have at the present time.

"The Court: There are some matters covered by law, and other matters covered by rule, and I expect we had better let the jury retire a few moments, and let's go into that matter."

The jury was excused, Court and counsel conferred, motions for mistrial were made and overruled, and the jury was recalled and they were thus further instructed by the Court:

"Mr. Foreman and Gentlemen of the Jury: The same thing that I conveyed to you earlier in the evening, still holds good, that I do not think it would be proper for the Court to answer your question, anything about the question of parole, and that matter should not in law influence your verdict in the case, as the Court sees it, that the jury has the duty to decide between life imprisonment, and capital punishment, and as I stated, if they do not give the death or life imprisonment, then, as to one of these offenses, it would be for the Court to impose a sentence of a term of years. But I wish to caution you, and very seriously to state to you that whatever might or might not, in your opinion, if you have any opinion, be done in regard to any parole, under the law should

not influence you in your verdict, that it is for you to do your duty as you see it, for you to assume that others will likewise perform their duty in a proper manner under all the circumstances."

It is urged that the request of counsel for their views indicated that there was a requirement as to the time to be served before there would be eligibility for parole and that there was a possibility of parole. It is also urged that the Court's comment that there were "some matters covered by law and other matters covered by rule", made as the jury were directed to retire, was an intimation to the jury that by law or by rule there were applicable provisions for parole and fixing eligibility for parole.

The Fourth Circuit has said:

"The jury had nothing to do with the punishment of the defendant, except that under the statute they might decide whether or not he should be given capital punishment; and to charge as to eligibility for parole after fifteen years was to becloud the issue before them and open the way to a compromise verdict. What they were to decide was whether defendant was guilty or not and, if so, whether he should be given capital punishment. Whether he should be paroled after fifteen years, if not given capital punishment, was a matter which they could not decide and which should not have been called to their attention, even though they were told at the same time that they had nothing to do with it." Lovely v. United States, 4 Cir., 1948, 169 F.2d 386, 391.

█ If the jury had fixed the death penalty for kidnapping or if it had the right to fix the sentence for rape we would be confronted with the question as to whether the Court's comment and further instruction were prejudicial error. But since the jury fixed life imprisonment for kidnapping and should have had no part in fixing the penalty on the rape convictions, the errors com-

plained of with respect to the Court's comments on parole, if they be errors, are harmless. 28 U.S.C.A. § 2111.

The appellants insist that there was insufficient evidence to submit to the jury on any of the counts. As to the Lindbergh Act and Dyer Act counts it is argued that there was no substantial evidence that the offenses were committed in the Chickamauga and Chattanooga National Military Park. There is no question as to the stolen car being taken by both defendants with the victim of their assaults from Chattanooga in Tennessee into the Park in Georgia. Nor can there be any real question as to the sufficiency of the evidence to prove the rape of the victim by George Krull, aided and abetted by Michael Krull, in the confines of the Park and this evidence is so free from doubt that we feel no reluctance in refraining from a recital of the sordid details of the testimony by which these offenses were proved.

The contention that there was no substantial evidence to sustain Michael Krull's conviction of rape and George Krull's conviction of aiding and abetting under Count 2 is presented with more plausibility.

From testimony which the jury was entitled to believe, it appeared that the brothers Krull had arrived in Chattanooga four days before the occurrences here related in the car of and in company with Edward Bice. In Chattanooga Bice had a stepbrother, Paul Allen, who was a paraplegic amputee. The four of them were riding around Chattanooga in the Bice car with Bice driving. Michael had a knife. George borrowed Allen's knife. The appellants had an argument between themselves and left the car. Bice drove along slowly. The Krulls came upon the victim in a car belonging to her brother. At the point of a knife in the hands of George Krull she was threatened with death if she screamed. George Krull took the wheel of the car, Michael Krull entered from the other side and they drove away. They pass-

ed Bice and Allen in the Bice car. Bice followed. The car with the Krulls and the victim of the kidnapping and the attacks stopped at a store in Rossville, Georgia, where Michael Krull came back and told Bice and Allen that she didn't have any money but could call a lady and get a thousand dollars if they would let her to a telephone. Bice said he wanted no part of that and made a recommendation to "get rid of the car and be done with it". The two cars moved on and in the same direction, that is, South. Bice and Allen, following the other car, went on past Oglethorpe. Bice and Allen lost track of the other car which George Krull was still driving after it entered the park. After leaving Rossville, two miles North of the boundary of the park, the appellants conversed in a foreign language. After, as the victim testified, "we didn't drive too far", Michael Krull compelled her to get into the back of the car, from which the back seat had been removed, and made a criminal attack upon her. In her words, "He assaulted me for ever so long". Then Michael Krull said to his brother "I'm through with her, do you want her". The car slowed down, perhaps stopped, and the brothers changed places; Michael Krull driving the car and George Krull criminally attacking the victim. Bice and Allen drove around the park and came upon the other automobile on Snodgrass Hill which is in the park and about four and a half miles from Rossville. The attack upon the victim by George Krull had not then been completed. George Krull took the victim from the car and again made an assault of rape upon her.

This is the proof from which a determination is required on the sufficiency of the evidence on Count 2 of the indictment. It is no longer open to question that

"The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315

# 138

U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680.

The language quoted was adopted and applied by this Court in Lloyd v. United States, 5 Cir., 226 F.2d 9. Among other decisions illustrative of the rule are Humes v. United States, 170 U.S. 210, 18 S.Ct. 602, 42 L.Ed. 1011; Crumpton v. United States, 138 U.S. 361, 11 S.Ct. 355, 34 L.Ed. 958; Ward v. United States, 5 Cir., 1952, 195 F.2d 441; Pullin v. United States, 5 Cir., 1939, 104 F.2d 57; Beland v. United States, 5 Cir., 1938, 100 F.2d 289, certiorari denied 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037; Riddle v. United States, 5 Cir., 1922, 279 F. 216. Applying this test to the record submitted to us we find there was substantial evidence to support the verdict of guilty on Count 2 of the indictment as to both appellants.

The sentence and judgment on the verdict of guilty of the charges of Counts 2 and 3 of the indictment are reversed and the cause is remanded for the re-sentencing by the Court of the appellants upon the verdicts of guilt returned by the jury on these counts. In all other respects the sentence and judgment are affirmed. For the re-sentencing of the appellants on the Count 2 and Count 3 convictions in accordance with the views herein expressed the cause is

Reversed and remanded.

CAMERON, Circuit Judge (concurring in part and dissenting in part).

I concur in the able opinion of the majority except as it orders remand of the case for re-sentence under Counts 2 and 3 of the indictment. It seems perfectly clear to me that the trial Court was of the opinion that the death penalty was proper, without any regard for or giving any effect to, that portion of the jury's verdict relating to the penalties on the rape counts. I think, therefore, the judgment appealed from, entered after a most carefully conducted trial in which all rights of the accused were scrupulously safeguarded, should be affirmed in all of its parts.