**Brian Christopher VOLK, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. CR 96–0342 CRB.**

United States District Court, N.D. California.

May 28, 1999.

Mary McNamara, Swanson & McNamara, San Francisco, CA, for appellant.

Laurel Beeler, U.S. Attorney's Office, San Francisco, CA, for appellee.

**ORDER**

BREYER, District Judge.

This case comes on appeal by defendant Brian Christopher Volk from a conviction for driving under the influence of alcohol entered by Magistrate Judge Maria Elena James following a bench trial on September 16, 1998. For the reasons set forth below, the conviction is affirmed.

*BACKGROUND*

The following evidence was presented at trial:

During the evening of June 8, 1996, Officer Ronald West of the U.S. Park Police observed a jeep driven by the defendant traveling at a high rate of speed on Funston Boulevard in the Presidio of San Francisco. The defendant failed to stop at a posted stop sign at the northeast corner of Funston and Lincoln Boulevards, and turned northward onto Lincoln Boulevard. Officer West stopped the defendant and

requested his driver's license and registration, at which point he could detect the odor of alcoholic beverages emanating from the defendant's breath and from inside the jeep. When he asked the defendant whether he had been drinking, the defendant responded, "Absolutely not. Say, partner, could you tell me how to find Union Street?"

After determining that the defendant's license was valid and that there were no outstanding warrants for his arrest, Officer West asked the defendant to step out of the jeep so that he could administer a series of field sobriety tests ("FSTs"). He first performed the "Nystagmus test," which involves measuring the movement and tracking ability of the eyes. Although the United States did not offer the results of the Nystagmus test at trial, Officer West did observe at this juncture that the defendant's eyes were bloodshot and glassy, and that he swayed from side to side.

Officer West then administered the "walk and turn test" on the defendant. He instructed the defendant to keep his hands at his sides and place his left foot in front of his right foot, heel to toe, continuing for nine steps while counting out loud. At step nine, he instructed the defendant to pivot on his front foot and take little steps to turn around and continue in the opposite direction for nine steps. According to Officer West, defendant failed to follow all the instructions when taking this test, because he made an "immediate," "military" about-face rather than taking small steps and pivoting. Officer West also felt that the defendant failed to follow instructions because he failed to touch heel-to-toe on step eight of the nine return steps.

Next, Officer West administered the "one-leg stand test." He instructed the defendant to stand with his feet together and his hands at his side, raise either foot approximately six inches off the ground, look at the toe of the raised foot, and count to thirty. He told the defendant that if the raised foot dropped during the test, he was to raise the foot again, and continue to count. Officer West observed that the defendant swayed from side to side and hopped up and down on the planted foot when he performed this test.

The officer then instructed the defendant to write the letters of the alphabet, A through Z, on a piece of paper. He observed that the letters were "somewhat jumbled" and that the defendant appeared to make some mistakes at the middle portion and at the end. A copy of this test was admitted at trial.

Officer West next instructed the defendant to perform the "finger-count test," which involved taking the thumb of one hand and touching each finger on that hand in succession while counting out loud (one, two, three, four) and then backwards (four, three, two, one). Officer West observed that the defendant "continually missed the fourth finger" when he counted backwards and "stumbled over" the number two when pointing to his middle finger.

The final field test conducted by Officer West was the preliminary alcohol screen test ("PAS"), in which the defendant was required to blow into a small device that would provide a reading of the defendant's estimated blood alcohol content. Although the government did not introduce the specific results of the PAS at trial, Officer West did testify that the reading confirmed what he had detected when he first made the traffic stop—that defendant had consumed alcohol. Further, while he administered this test, Officer West again detected the odor of alcohol on the defendant's breath.

After administering these tests, Officer West arrested the defendant for possibly driving under the influence of alcohol. He testified that he made the decision to arrest the defendant based upon "the sum of all the tests taken together," combined with his personal observations of the defendant.

Incident to the arrest, Officer West searched the defendant's jeep and discovered a plastic Starbuck's coffee cup with a straw containing a liquid that had the appearance and odor of beer. In addition, he recovered an empty bottle of beer from underneath the driver's seat and two empty bottles of malt liquor from behind the driver's seat.

Officer West then transported the defendant to the U.S. Park Police Presidio field office for processing and to administer tests on an alcohol measuring device known as the Intoxilyzer 5000. Defendant registered alcohol levels of .193 and .190 in the two tests conducted by Officer West— more than two times the legal limit of .08.

The government charged defendant with one count of driving under the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1) and one count of driving with a blood alcohol level in excess of .08% in violation of 36 C.F.R. § 4.23(a)(2). The trial court found defendant guilty of both counts, holding that the evidence of the Intoxilyzer test results combined with Officer West's observations demonstrated beyond a reasonable doubt that he had committed the offenses.

Defendant challenges his conviction on three grounds. First, he argues that the trial court did not have subject matter jurisdiction over the case, because the government failed to provide sufficient evidence that the above-described events took place on federal land. Second, defendant argues that the trial court erred by failing to hold an evidentiary hearing on the reliability of the field tests administered by Officer West before allowing testimony on these tests during the bench trial. Finally, defendant argues that the results of the Intoxilyzer tests (in addition to the field sobriety tests) were inadmissible, and that

the remaining evidence was insufficient to support his conviction.

## STANDARD OF REVIEW

 The scope of appeal from a judgment of conviction by a magistrate judge is the same as an appeal from the judgment of a district court to a court of appeals. Fed.R.Crim.P. 58(g)(2)(D). Accordingly, the existence of subject matter jurisdiction is a question of law reviewed de novo. *Bidart Bros. v. California Apple Comm'n,* 73 F.3d 925, 928 (9th Cir.1996). The question whether the magistrate judge properly admitted Officer West's testimony regarding the defendant's performance on the field tests is reviewed for abuse of discretion. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, ——, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). Finally, with regard to the sufficiency of the evidence presented at trial, where, as here, the defendant moved at trial for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a), the reviewing court examines the record to determine "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Roston,* 986 F.2d 1287, 1289 (9th Cir.1993) (quoting *United States v. Sharif,* 817 F.2d 1375, 1377 (9th Cir.1987)).

## DISCUSSION

### A. Subject Matter Jurisdiction

 Defendant first argues that the trial court lacked subject matter jurisdiction because the government presented insufficient evidence that the offense took place in the Presidio.[1] This argument is not well taken. It is undisputed that the defendant was stopped near the intersec-

1. The relevant jurisdictional statute provides that in order for a federal court to exercise jurisdiction over the action, the offense must have occurred within "lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise

acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3). It is undisputed that the Presidio falls within the reach of this statute.

tion of Funston and Lincoln Boulevards. Nor is it disputed that these streets are within the Presidio, which in turn is under federal jurisdiction. During the testimony of Officer West—in which he identified the area of the stop as being located within the Presidio—the government established that he is a U.S. Park police officer responsible for patrolling the Presidio with personal knowledge of the area and its boundaries. The government also elicited testimony from Officer West that the Presidio was under federal jurisdiction.[2] The officer actually drew diagrams for the Court to illustrate these points. Therefore, the government presented sufficient evidence to establish subject matter jurisdiction.

Defendant's citation to *Krull v. United States*, 240 F.2d 122 (5th Cir.1957), is unavailing. During the trial in that case, the existence of subject matter jurisdiction over a crime that allegedly occurred on federal land was hotly contested, because the defendant argued that the United States never obtained proper title to that land. *See id.* at 127–28. The Fifth Circuit simply held that notwithstanding any potential defects in title, the United States exercised de facto jurisdiction over the area based on its possession and control of the land. *See id.* at 128. The court further held that maps introduced by the government at trial were properly admitted "to show boundaries and to establish the location of the place over which the jurisdiction of the United States was exercised ..." *Id.*

The government may very well have felt compelled to introduce such evidence in that case in light of the defendant's argument that the crime did not occur on federal land. *See id.* at 129. Had defendant contested the location of the offense in this case, the government would likely have born a heavier burden to prove this element of the crime. However, there is no indication in the *Krull* opinion—nor in any other that the Court is aware of—that such a detailed demonstration is required when the site of the offense in question, and the location of that site within the jurisdiction of the federal government, is undisputed. At no stage in the proceedings below was any doubt raised that the offense occurred within the Presidio, or that the Presidio falls within the jurisdiction of the United States. Accordingly, the trial court properly exercised subject matter jurisdiction.

## B. Field Sobriety Tests

■ Defendant next argues that the trial court erred in admitting the portion of Officer West's testimony derived from his administration of the field sobriety tests without first holding a hearing to determine whether this testimony met the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In *Daubert*, the U.S. Supreme Court held that under Federal Rule of Evidence 702, trial courts are assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is rele-

2. Furthermore, even if the government had failed to establish that the Presidio falls within the jurisdiction of the United States, this Court would take judicial notice of that fact pursuant to Federal Rule of Evidence 201. Counsel for the defendant suggested in oral argument that resort to FRE 201 in this regard would be inappropriate, because the issue of whether the offense took place on federal land is an essential element of the crime. Counsel is certainly correct that the government was required to prove that defendant committed the offense on federal land. If it had failed to submit evidence regarding the location of the offense, it may very well be

inappropriate for the Court to take judicial notice of the fact that the offense took place on the Presidio, because this would be tantamount to taking judicial notice of an essential element of the crime. Here, however, the Court would merely be taking notice of the fact that the Presidio is under federal jurisdiction, the government having already demonstrated that the offense occurred in the Presidio. Aside from being widely recognized within the Northern District of California, this undisputed fact has been formally confirmed both legislatively and judicially. *See, e.g,* Pub.L. 104–333, 110 Stat. 4097; *United States v. Watkins,* 22 F.2d 437 (N.D.Cal.1927).

vant to the task at hand." *Id.* at 597, 113 S.Ct. 2786. The Court also set forth a number of specific factors that the trial court could apply when considering the reliability of scientific evidence—such as testing, peer review, error rates, and "acceptability" in the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

Recently, in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court held that the *Daubert* gatekeeping obligation—that is, the obligation of the trial court to ensure the reliability of expert testimony—does not merely apply when that testimony is characterized as "scientific." Rather, the Court explained, the trial court may invoke the *Daubert* factors whenever they are reasonable measures of the reliability of expert testimony. *See id.* at 1176.

■ Defendant argues that *Kumho Tire* *required* the trial court to conduct a pretrial evidentiary hearing to determine the reliability of Officer West's testimony regarding the FSTs. Implicit in defendant's argument is a basic, and very significant, misapprehension of the Court's ruling in *Kumho Tire.* Far from forcing upon trial courts a specific procedure for determining the reliability of expert testimony, the unanimous Court's well-reasoned opinion firmly reinforced the principle that trial courts have broad discretion in this regard:

> The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends on the particular circumstances of the particular case at issue.... Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining

whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.... Otherwise, the trial judge would lack the discretionary authority needed to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.

*Id.* at 1175–76. Therefore, the inquiry on appeal cannot be grounded in the misapprehension that *Kumho Tire* somehow requires the trial court to undertake a mechanistic application of the *Daubert* factors or to conduct a pre-trial evidentiary hearing whenever one side disputes the foundation of the other side's expert testimony. Rather, the appellate court must simply review the trial court's admission of the testimony—*and the process by which the trial court made its decision*—for abuse of discretion. The trial court certainly has an obligation to prevent irrelevant or unreliable evidence from being admitted pursuant to FRE 702. However, in considering the trial court's evidentiary ruling, the reviewing court must be mindful that some proffered expert testimony might require an application of some of the *Daubert* factors while other expert testimony may not, and that the trial court has broad latitude to make this determination.[3]

3. Most of Officer West's testimony, of course, cannot be considered "expert" testimony within the meaning of FRE 702. His testimony that the defendant's breath smelled of alco-

hol, that the smell of alcohol emanated from the vehicle, that the defendant made an absolute denial that he had been drinking, that defendant's eyes were bloodshot and that de-

Here, in response to the defendant's motion in limine to exclude evidence of the FSTs on the grounds that they fail to satisfy the *Daubert* analysis, the trial court ruled that the tests are designed to examine behavior that "is widely accepted as indicative of impairment or intoxication." The court quoted and relied in part on the case of *United States v. Everett*, 972 F.Supp. 1313 (D.Nev.1997), which stated:

All of the manifestations observed by the officer can be traced, ultimately, to some scientific principle of physiology. That does not make the officer's testimony scientific. *It is, however, observed and given based on the officer's specialized experience and training that permits the officer to recognize indicators of intoxication.*

972 F.Supp. at 1320 (emphasis added). The court thus concluded that a law enforcement officer's testimony regarding a subject's performance on "routine field sobriety tests" need not be subjected to the rigors of the *Daubert* analysis.

At trial, the government laid the foundation for Officer West's "specialized experience and training," that permitted him to "recognize indicators of intoxication." He explained that

[f]ield sobriety tests are what a police officer uses on an individual whom he or she suspects are driving under the influence of alcohol, to form independent observations to either confirm or deny the fact that the individual may have been driving under the influence of alcohol.... The tests which I administered to the defendant are tests which I give each time I made a traffic investigation

if the person had a physical defect which would prevent him from performing any series of tests.

RT, 43–45. Officer West further testified that he had received specific training on how to conduct field sobriety tests and that he had performed such tests on approximately 100 individuals.

In light of the foregoing, it cannot be said that the trial court abused its discretion in admitting the portion of Officer West's testimony pertaining to the FSTs. Although the court declined to hold an evidentiary hearing or formally apply the *Daubert* factors, the record reflects an adequate consideration of the reliability of the testimony before admitting it. In essence, the court found that testimony by a police officer who has specialized knowledge and experience with regard to intoxication and the nature of field sobriety testing was sufficiently reliable that no further analysis was required. Once the government laid the foundation for Officer West's specialized knowledge, it was not an abuse of discretion for the trial court to deem his testimony sufficiently reliable to be admitted pursuant to FRE 702.[4]

■ In arguing that the FSTs should have been excluded, defendant advances a very credible argument that Officer West's testimony regarding defendant's performance on these tests was not highly probative of his level of intoxication. Indeed, while defendant's performance on some of the tests—such as the alphabet test—could have been helpful to the trier of fact, it is difficult to imagine how defendant's perfor-

---

fendant swayed back and forth is based on common observations that are not so technical or complex as to require qualification as the opinion of an expert. However, to the extent that Officer West testified about the conclusions he drew from his administration of the field sobriety tests, about which he had specialized knowledge, this evidence certainly appears to fall within the ambit of FRE 702.

4. Concededly, the trial court's ruling rested on the assumption, rejected by the Supreme Court in *Kumho Tire*, that evidence offered

pursuant to FRE 702 is to be analyzed differently depending on whether it is classified as "scientific" as opposed to merely "technical" or "specialized." The court stated that because the FSTs were not "scientific in nature," they were admissible without being subjected to the *Daubert* reliability standards. However, the court did not admit the testimony on the sole ground that it was not scientific; rather, the court made a finding that such testimony is reliable.

mance on the walk and turn test could have bolstered a finding of intoxication. Defendant also makes the credible contention that "the FSTs as described by Officer West appear to have been designed so as to trip up their subject by focusing on ability to memorize a complex series of instructions under stress-filled circumstances." However, defendant's argument in this regard goes to the weight of Officer West's testimony, not its admissibility under FRE 702. Defendant was free to call the officer's conclusions into question at trial, and his counsel did so in an able manner. However, as Officer West testified, his decision to arrest the defendant was based not on any one factor, but on his observations in light of the totality of the circumstances. The fact that one or more of the individual tests may not have been highly probative of defendant's level of intoxication does not necessarily lead to the conclusion that his testimony regarding these tests was not relevant or reliable under FRE 702. The testimony was relevant, and its probative value was properly reserved for consideration by the trier of fact.[5]

Aside from relevance, a major principle underlying the *Daubert* gatekeeping function is that the trier of fact should not be unduly prejudiced by testimony that is based on foreign concepts. This concern was clearly prevalent in *Kumho Tire*, where the district judge was required to assess expert testimony regarding the condition of an allegedly defective tire that was based on a methodology and experience so foreign to the layperson as to cast doubt on the jury's ability to properly assess its probative value. However, as the trial court properly recognized in this case, similar concerns do not arise with respect to the administration of field sobriety tests. Although the conclusions that the officer derived from these tests (in combination with his other observations) were based in part on his specialized knowledge and experience, this knowledge and experience was not grounded in concepts so foreign that a trier of fact would not be capable of properly assessing the probative value of the testimony. Rather, the officer's conclusions—as well as defendant's criticism of these conclusions—was grounded in assumptions about levels of coordination and steadiness that are familiar to the layperson.

Therefore, the trial court did not abuse its discretion by admitting the portion of Officer West's testimony that related to his administration of the field sobriety tests.[6]

## C. Sufficiency of Evidence

Finally, defendant argues that the evidence presented at trial was insufficient to support his conviction. This argument rests on two premises: 1) that Officer West's testimony regarding his administration of the FSTs should have been ex-

---

5. The fact that defendant was convicted after a bench trial further highlights the need for flexibility that the Supreme Court emphasized in *Kumho Tire*. Here, the "gatekeeper" and the trier of fact were one and the same. Under these circumstances, it was particularly reasonable for the judge to admit the evidence pertaining to the FSTs, knowing that she would be responsible for assessing the probative value of this evidence at trial. Although this Court's ruling by no means turns on the fact that the trier of fact below was a judge rather than a jury, it bears noting that the *Daubert* gatekeeping obligation is less pressing in connection with a bench trial.

6. In addition to arguing that the evidence of the FSTs should have been excluded, defen-

dant suggests that once this evidence is no longer taken into account, Officer West lacked probable cause to arrest the defendant. Although the Court need not address this issue in light of its ruling regarding the FSTs, it bears noting the officer's observations likely support a finding of probable cause even in the absence of this testimony. As Officer West indicated, he detected the odor of alcohol on defendant's breath and emanating from his jeep. Further, defendant wholly denied that he had been consuming alcohol, even though it was obvious that he had. Finally, the officer observed that defendant's eyes were bloodshot and glassy, and that he swayed from side to side.

cluded; and 2) that evidence of defendant's Intoxilyzer test results obtained after the arrest was also inadmissible. Having addressed the admissibility of the FSTs in the previous section, the Court now turns to the admissibility of the Intoxilyzer test. Once again, the Court must review the trial court's ruling for abuse of discretion. *See, e.g., United States v. Brannon,* 146 F.3d 1194, 1196–97 (9th Cir.1998).

■ Defendant first argues that the government failed to lay a sufficient foundation for the admission of the test results, because the proper maintenance and calibration for the machine was called into question at trial. However, the government presented sufficient evidence to establish the accuracy of the tests. Sergeant Jansing, the officer at Presidio station responsible for conducting simulator testing on the Intoxilyzer, testified that calibration tests are performed on the machine at least every ten days and logged on a report. If the results of these tests did not fall within an acceptable range of .07 and .09 (with the legal limit of .08 being an accurate reading), Sergeant Jansing would conduct an investigation of the problem and contact a technician for maintenance if necessary. He testified at trial that from 1993 until the date of the defendant's arrest on June 8, 1996, he was not aware of any problems with the machine in question. Furthermore, the calibration records admitted at trial show that two days before the arrest, the machine tested at .075 and .070. Three days after the arrest, the machine tested at .075 and .071.

In addition, the government offered the testimony of Mr. Daniel Lee, a criminalist at the San Francisco Crime Laboratory who qualified as an expert to testify regarding the accuracy of the Intoxilyzer 5000. Mr. Lee testified that based on his review of the records described above, it was his opinion that the machine was operating properly on the date in question.[7]

___

7. Mr. Lee also provided an opinion that, based on the Intoxilyzer test results and taking into account standard alcohol burn-off

■ Counsel for the defendant skillfully attempted to call into question the condition of the Intoxilyzer at trial. For example, Mr. Lee admitted on cross-examination that if the breath tube of the machine had contained residual alcohol deposits that evening, an artificially high reading would have been given. Mr. Lee also stated that he did not know if the area in which the machine was stored had been painted shortly before the tests—a factor which that would have produced artificially high results. Again, however, these factors go to the weight of Mr. Lee's and Sergeant Jansing's testimony regarding the maintenance and calibration of the machine, not admissibility. In light of the records submitted and the witnesses' testimony regarding those records, the government laid an adequate foundation for the admission of the test results.

■ Next, defendant contends that the results were inadmissible because "the machine's science is based on a fundamental assumption as to average rates of absorption of alcohol into the bloodstream and not on any evidence of this defendant's actual alcohol absorption rate." Thus, "the government proved only that and *average person* would have given the test result achieved by defendant, not that the test result was in fact particular to this defendant."

■ Again, however, this contention is relevant with respect to the weight of the evidence that defendant's alcohol level was approximately .19, not its admissibility. The admissibility and general reliability of Intoxilyzer test results is well-established. In 1973, breathalyzers were certified as accurate by the National Highway Traffic Safety Administration. *See Brannon,* 146 F.3d at 1196. The methodology of the Intoxilyzer has achieved wide acceptance within the scientific community. *See, e.g.,*

rates, the alcohol level of the defendant at the time he was stopped by Officer West was .21.

*Brannon,* 146 F.3d at 1195–96; *United States v. Reid,* 929 F.2d 990, 994 (4th Cir.1991); *United States v. Smith,* 776 F.2d 892, 898 (10th Cir.1985). Accordingly, the trial court did not abuse its discretion in admitting the evidence of the test results.[8]

This leaves the question whether the evidence submitted at trial—including Officer West's testimony regarding the FSTs and the results of the Intoxilyzer—is sufficient to support the conviction. As mentioned previously, the inquiry on appeal is "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Roston,* 986 F.2d 1287, 1289 (9th Cir.1993) (quoting *United States v. Sharif,* 817 F.2d 1375, 1377 (9th Cir. 1987)).

The evidence presented at trial clearly meets this standard. After stopping the defendant in the Presidio, Officer West detected the odor of alcohol on defendant's breath and in his vehicle. When he administered the FSTs, the officer made further observations regarding the defendant's behavior and coordination that arguably confirmed his suspicions. In particular, defendant performed questionably on the alphabet test and swayed from side to side when taking the Nystagmus test. The officer again detected the odor of alcohol on defendant's breath during administration of this test. During the arrest, the officer discovered three empty bottles (two of them 16–ounce malt liquor bottles) and a coffee cup that contained beer—indicating that defendant deliberately set out to operate his vehicle while drinking alcohol and to conceal it from law enforcement. Defendant then admitted that he had been drinking, after lying about this fact initially. Finally, defendant tested at an alcohol level of approximately .19 at the Presidio station—more than two times the legal limit. The government present-

ed sufficient evidence as to the reliability of these test results. In light of the foregoing, there can be little doubt that the evidence supported a conviction.

## CONCLUSION

For the reasons set forth above, the judgment of conviction entered by the trial court in the above-captioned matter is AFFIRMED.

**IT IS SO ORDERED.**

---

**8.** Indeed, this issue provides another illustration of the notion that neither *Daubert* nor *Kumho Tire* requires a trial court to conduct an evidentiary hearing whenever testimony regarding scientific evidence is presented.