513 So.2d 574 (1987)
Henry Paul JORDAN
v.
STATE of Mississippi.
No. 56627.
Supreme Court of Mississippi.
September 23, 1987.
*575 Boyce Holleman, Michael B. Holleman, Gulfport, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and DAN M. LEE and SULLIVAN, JJ.
DAN M. LEE, Justice for the Court:
Henry Paul Jordan was indicted for murder for the November 12, 1981, killing of Robert L. Hargett. Hargett was the Jordan family's minister, and he was shot with Jordan's gun after Jordan discovered him having sex with Jordan's wife, Florence. Jordan's defense was that of self-defense; he claimed that he and Hargett scuffled, and his gun went off during the struggle. Florence Jordan was also wounded in the incident.
The jury found Jordan guilty of manslaughter, and he was sentenced to 10 years in the custody of the Mississippi Department of Corrections. Jordan appeals, assigning the following as error:

I.
The court erred in not directing a verdict of not guilty at the conclusion of the State's case.

II.
The verdict of the jury must rest exclusively on the testimony of the Defendant and his wife who were the sole eyewitnesses to the events which transpired in the room where the decedent met his death, and not being inconsistent with physical facts, said testimony should be accepted as true and the defendant should have been granted a directed verdict of not guilty.

III.
The court erred in not declaring a mistrial on the Motion of the Defendant made at the time of the selection of the jury when the name of the Defendant's wife was called in open court for the reason that the State of Mississippi had placed her name on the indictment against this Defendant contrary to law, and as a result of said action, said Defendant was forced to place his wife on the stand as a witness.

IV.
The court erred in permitting the witness, Henley, to testify to incriminating statements alleged to have been made by the Defendant's wife in the hospital.

V.
The court committed grievous error in permitting the witness, Henley, to place into testimony alleged statements made by the Defendant to his wife, which statements were admitted by virtue of the testimony of the witness, Henley, over the objection of the Defendant. The Defendant alleges that said error could not be cured by the court because of the highly prejudicial nature of the statements and that to permit the out of court hearsay statement, based upon hearsay, was erroneous.
We find no reversible error herein, therefore, affirm the judgment below.
This case involves primarily three long-time residents of Waveland, Mississippi: *576 Henry Paul Jordan; his wife, Florence Jordan; and their pastor, Reverend Robert L. Hargett. At the time of the shooting, Jordan was a 30-year-old railroad welder, and an auxiliary policeman with the Bay St. Louis police department. He had known Florence since they were children attending the Lizana Baptist Church, and they were married there in 1971.
Florence and Paul Jordan had been married for about five years when, in 1976, she went to their pastor, Reverend Hargett, for marriage counselling. At about the same time, she began working for Hargett as a secretary in his construction business. She worked for him until 1980, and it was during this time that she and Hargett became intimate with each other. Their affair was made easier by the fact that Florence was active in the church and sang in the choir. Jordan testified at trial that he knew nothing about the relationship, and that no one ever discussed it with him.
On November 12, 1981, the day of the shooting, Jordan worked his regular 7-4 shift at the railroad, came home and ate supper, and then went to work a ball game for the police department. Florence had planned to take the children with her to choir practice. However, the piano player didn't show up, so she asked her sister-in-law to keep the children, and she went to Hargett Construction Company to meet Robert Hargett. She parked her car in back of the building, and sat inside the dark office for a while with Hargett, talking, before they partially undressed and had sex on the sofa.
In the meantime, Jordan checked in to work the ballgame at 6:30 p.m., and stayed at the stadium until about 9:20. At about that same time, Charles James, of the Waveland Police Department, was patrolling the area around Hargett Construction when he saw a Ford Thunderbird parked behind it. He radioed the tag number in and discovered that the car was registered to Jordan. Jordan was riding back to the Bay St. Louis police station with three other officers when he heard the dispatcher responding to Officer James, and he heard James respond that someone needed to tell Jordan to come move his car. He got on the radio and said that he would come check on the automobile.
Jordan dropped the other officers off at the police station, and drove his father's car out to Hargett Construction to investigate. He stated that he had no idea what his car would be doing there. Jordan parked in the back and walked around the building to the door of Hargett Construction. Although there was no moonlight that night, or lights in the building's parking lot, there was some light from a bar across the street. He saw Hargett's car, and, through the window of the building, he could see what looked to him like two people "tussling" on the couch. According to Florence, she and Hargett were sitting on the couch, partially nude, when Hargett pulled her onto his chest. At that moment, she looked up through the window and saw Jordan coming around the building.
According to Jordan, his instinctive reaction when he saw signs of a possible struggle inside the building was to kick the door in. His wife immediately jumped up from the couch, and he stood, staring in shock, at the sight of her  naked from the waist down. At that point, Hargett jumped off the couch, ran to Jordan, and grabbed him from behind. They began struggling over his gun, which was in its holster. During the struggle, the gun went off, and Florence fell to the floor. The struggle continued, and the gun went off several more times. Ultimately, Hargett fell to the floor, dead. Jordan immediately called the Waveland Police and told them there had been a shooting. He then went to his wife, who was unconscious from a flesh wound. Florence came to and asked Jordan to help her get her clothes on before the police got there. When Jordan complied with her request, he found that she was bleeding on the left side. A few minutes passed before help arrived, and, in the interim, Jordan attempted unsuccessfully to hail a passing county patrol car. He also called the police again; however, officers arrived before he completed the call.
Florence's story essentially corroborated her husband's. She testified that she *577 jumped off the couch as soon as she realized Jordan was outside the building, and ran around the coffee table. She also testified that Jordan kicked the door in, and then stood for a moment, staring at her. Then, Hargett ran to him and they wrestled for the gun. She felt a tingle when the gun went off, and then she passed out. When she came to, Jordan was standing over her, and they both were crying. After Jordan helped her put her clothes on, she saw Hargett's body, and passed out again.
Officer James testified that he got a signal to return to Hargett Construction at about 9:54 p.m., to respond to a report of a death. Hancock County Deputies also heard the dispatch, and went to back up James. They found Jordan standing at the window of the building, talking on the phone. When he saw the police arrive, Jordan immediately exited the building and surrendered. He holstered his weapon, handed it to the officers, identified himself, and stated that he had shot Hargett and his wife.
The officers found Florence conscious, dressed, and with a gunshot wound in her left side. Hargett was dead at the scene. The room was in a state of disarray  the coffee table had been overturned, the glass on it was broken, a lamp was turned over, an ashtray was in the middle of the floor, and magazines were scattered about the floor. Additionally, one bullet was recovered from the east wall of the office, one from the west wall, and one lying beside Hargett. Hargett had a bullet wound in the palm of his right hand, in the left side of his face, below his right armpit, and in the left side. The bullets which struck Hargett on the left side of his face and on his left side were still lodged in his body.
Jordan was taken into custody and given his Miranda warnings. At the Waveland Police Station, he gave the following statement to Officer Robert Tartavoulle (note: these statements were not taken down, verbatim, as Jordan made them, but were notes that Tartavoulle recorded the next day). Jordan had been working the football game. He was on his way to the station when he heard his car registration over the radio. He entered the conversation and told the Dispatcher that he would come to get the car. Jordan checked out at the Police Department and drove to Hargett Construction. There was no light on in the building, so he kicked the door in. Florence jumped up off the couch, and he shot her first. Then, Hargett jumped up and came at him. Jordan shot Hargett and kept shooting. He then called Waveland to send the police. As he waited for the police, he called the dispatcher again, but saw the police car coming, so he hung up. Jordan stated that he had a feeling that his wife was having an affair, and thought he could catch them. Although Jordan made this oral statement, he would not give a statement in writing until he talked to a lawyer.
Florence also made a statement after the incident to Officer Sandra Henley of the Waveland Police Department, who interviewed Florence in the hospital. She said that she was standing in front of the sofa when Jordan shot her, and that Jordan then told Hargett that he was next.
Jordan was indicted on April 7, 1982. Listed as a witness on the indictment was Florence Jordan. Jordan moved to quash the indictment, on grounds that his wife was called to testify against him to the grand jury. The record does not indicate what disposition was made of the motion, but, presumably, it was denied. The first trial of Jordan, conducted on April 4-5, 1983, resulted in a mistrial when it was found that the State had not provided Jordan with full discovery.
During voir dire at the second trial, the trial judge asked the potential jurors whether they knew any of the witnesses who were to testify. During this questioning, he made the following comment: "And, Florence Jordan, listed at 409 Ulman Avenue. Anybody acquainted with her?" The defendant's attorney approached the bench shortly thereafter and moved for a mistrial. The court overruled the motion, stating that "I did not realize, of course, that it was his wife. However, I don't think that it prejudiced the case, inasmuch as none of them knew her anyhow." The *578 defense ultimately called Florence Jordan to testify, and, in rebuttal, the State called Sandra Henley to testify to her statement in the hospital.
After testimony was completed, the jury began deliberation at 4:55 p.m. At 8:55 p.m., the court received a note from the jury saying, "The jury is deadlocked over the possibility of Jordan acting in self-defense. One of the jurors seems to be in need of additional instruction on what constitutes self-defense." The court instructed the jurors to review the instructions on self-defense.
At 11:37 p.m., the jury returned to the courtroom to announce that it still had not reached a verdict. Juror Nybo told the court that the vote at that time was 11-1, and stated, "Now, I would, I would not say, Your Honor, that we are firmly and finally deadlocked. I would say that we have not reached a verdict." The court sent the jury back for further deliberation. (These actions are not the subject of assigned error.) About an hour later, at 12:40 a.m., the jury returned a verdict of guilty of manslaughter. The court waited until a later date to sentence Jordan, ultimately handing down a sentence of 10 years in the custody of the Mississippi Department of Corrections, with a promise by the trial court to cooperate in his early release.

I. DID THE TRIAL COURT ERR IN NOT DIRECTING A VERDICT OF NOT GUILTY AT THE CONCLUSION OF THE STATE'S CASE?
The State argues that Jordan waived his right to challenge the failure of the trial court to direct a verdict when he went on to present evidence in his behalf. That contention has been effectively negated by the case of Wetz v. State, 503 So.2d 803 (Miss. 1987). In that case, Justice Robertson, writing for the Court, explained the waiver rule as follows:
By offering evidence of his own, the defendant in no way waives the right to challenge the sufficiency or weight of the evidence in the event of an adverse jury verdict. What the waiver rule means is that the defendant must proceed on the basis of the evidence before the court at the time the challenge is made and not in the limited state of the record which may have existed back when the motion for a directed verdict was originally made.
Id. at 808, n. 3. Thus, Jordan may still appeal the alleged inadequacy in the State's evidence, but he must do so based on the entire record, not just on the State's case. Wetz also held that the proper standard of review on appeal is to consider all of the evidence in the light most favorable to the verdict. "The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence." Id., citing Hammond v. State, 465 So.2d 1031, 1035 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984); Glass v. State, 278 So.2d 384, 386 (Miss. 1973).
Jordan's story was that he went to Hargett Construction completely unaware of the situation between Hargett and his wife, kicked the door in out of apprehension that someone might have been in trouble, was attacked by Hargett, and, in the struggle over his gun, shot Florence and killed Hargett. However, the evidence before the jury included a statement that Jordan suspected that his wife and Hargett were having an affair, and he thought he could catch them. The light conditions around the building may have been so poor as to contradict Jordan's story of seeing two people "tussling" inside. Florence's statement after the shooting was that he burst in, shot her, and told Hargett he was next. Jordan did not tell the arresting officers of the struggle between him and Hargett, and the overturned furniture could have been consistent with Hargett's death throes and not a fight between him and Jordan. Viewing these facts in the light most favorable to the State, it would not have been unreasonable for the jury to believe that Jordan went to Hargett Construction fully expecting to find Hargett and his wife in flagrante delicto and fully prepared to do something about it. Thus, the jury could have believed the version of the facts recounted in the State's closing argument: that Jordan parked his car behind *579 the building and tiptoed around it, so as to surprise his victims, then kicked the door in and entered with his pistol blazing, wounding his wife and killing Hargett. These inferences would support the manslaughter verdict, and, thus, there is no merit to this assigned error.

II. DID THE TRIAL COURT IMPROPERLY OVERLOOK THE WEATHERSBY RULE?
The Weathersby rule applies unless the defendant's or his eyewitness's story is "substantially contradicted in material particulars by credible evidence, physical facts or by facts of common knowledge." Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933). "Under such circumstances we have always mandated that preremptory instructions be granted whether under the label of Weathersby or otherwise." Wetz, 503 So.2d at 808.
In this case, the physical evidence was not inconsistent with Jordan's story of a life-and-death struggle: the disarray of the room, the placement of the recovered bullets, and the wounds to both sides of Hargett's body. His story was not contradicted by the direct testimony of his wife. However, two conflicting pieces of evidence appear in this record. First, Florence's statement at the hospital was that Jordan shot her, then told Hargett, "You're next." The second piece of contradictory testimony was the statement that Jordan gave to the police. In the first statement, made at the scene, Jordan merely said that he had shot Florence and Hargett, without mentioning any struggle. (The policeman who heard this also testified that Jordan was not injured, nor was his clothing in disarray.) Jordan's second statement, made at the police station, was that Florence jumped up off the couch, and he shot her; then, Hargett jumped up and came at him. At that point, he said, he shot Hargett, and kept shooting.
Jordan's statements do not flatly contradict his testimony at trial, but neither do they support it. This case is similar to May v. State, 460 So.2d 778 (Miss. 1984) and Simpson v. State, 497 So.2d 424 (Miss. 1986), where this Court refused to apply the Weathersby rule. In May, where a wife shot and killed her husband, the defendant's initial story to police described her struggle. Her second story had Mrs. May shooting her husband deliberately, after a scuffle. Her testimony at trial was that she fired the shot from behind a deep freeze as her husband came after her with a stick. No stick was found on Mr. May's body, only a pair of bedroom slippers. The Court wrote that "a defendant's voluntary statement made to law enforcement officers shortly after the incident may conflict in substantial particulars with his or her testimony at trial [and] may be a significant factor in taking a case out of the Weathersby rule." 460 So.2d at 782.
In Simpson, the defendant shot a man whom he surprised in his home. Immediately after the shooting, he called the police and stated "I shot a son of a bitch. He was in the bed with my wife." After being taken into custody, he told the police that he shot the decedent twice while he was still in the bed. At trial, he testified that the decedent reached under the bedclothes for what the defendant thought to be a weapon. He said that he shot him once then, and, when the defendant staggered out into the hall, he shot him again, in self-defense. "We hold here that Simpson's statement to the police contradicts in material particulars his testimony at trial, and, thus, he was not entitled to a peremptory instruction." 497 So.2d at 432.
Although it is a closer call in this case than in the ones cited above, the appellant's stories did differ in material particulars with his testimony at trial. A struggle of the magnitude described by Jordan should reasonably have been mentioned to the officers at the scene, and those who later investigated the incident. We conclude that Jordan should not be given the benefit of a peremptory instruction under the Weathersby rationale.

III. SHOULD THE TRIAL COURT HAVE DECLARED A MISTRIAL WHEN FLORENCE JORDAN'S NAME WAS MENTIONED IN OPEN COURT DURING VOIR DIRE?
The argument of the appellant under this assignment of error is that, when the trial *580 judge asked the jury during voir dire if any of them knew Florence Jordan, he impermissibly brought her to their attention as a witness to the crime. Thus, Jordan was forced to call his wife as a witness to prevent the jury's speculation as to what her testimony would have been. Had she not been called, then Officer Henley could not have testified to the statement that Florence Jordan gave her in the hospital. The State's argument is that, given the circumstances of this case, it would have become obvious to the jury during trial that Mrs. Jordan was a witness to the crime; thus, there still would have been speculation as to why she was called. Furthermore, the State argues, since Florence's testimony was so favorable to her husband, it was obvious that he was planning to call her as a witness, anyway.
In Wideman v. State, 339 So.2d 1378 (Miss. 1976), the prosecutor called the defendant's wife to the stand, forcing the defendant to object to her testimony. The Court refused to find reversible error therein, noting that she later testified as her husband's witness, "and she testified at length on direct and cross-examination. The record does not reflect that appellant felt compelled to call his wife on account of the conduct of the prosecuting attorney. Thus, if error was committed, it became harmless when the wife testified on behalf of appellant." Id. at 1381.
Jordan's attorney indicated when he moved for a mistrial that he would be forced to put Mrs. Jordan on the stand to avoid prejudice on the part of the jury. However, a close review of this record leads us to believe that it was Jordan's intent to put his wife on the stand from the beginning of trial. Her testimony was immensely favorable to him, since it corroborated his story in almost every detail. Furthermore, his insistence on a Weathersby instruction would have been fruitless without her testimony. Weathersby only applies where the story of the defendant and any eyewitness is corroborated by other evidence. Thus, we find that this case falls squarely under the Wideman rationale, and any error made by the trial court in mentioning Florence Jordan's name during voir dire was harmless.

IV. DID THE COURT ERR IN ADMITTING STATEMENT MADE BY FLORENCE JORDAN TO OFFICER HENLEY, WHICH INCLUDED REMARKS UTTERED BY JORDAN TO HIS WIFE AT THE TIME OF THE SHOOTING?
The crux of this assignment of error is the testimony of Officer Sandra Henley, who interviewed Mrs. Jordan at the hospital. Henley's testified, on rebuttal, that Mrs. Jordan told her that after Jordan shot her, he told Hargett, "You're next." Thus, Henley's testimony contained hearsay and, allegedly, constituted a violation of Miss. Code Ann. § 13-1-5 (Supp. 1986) on spousal immunity. Furthermore, the appellant asserts that it was inherently an unreliable statement, due to Florence's medicated state, and was admitted before the State laid the proper predicate for impeachment. The State argues that Jordan is procedurally barred from appealing this statement because he did not object to the testimony on these grounds.
The record shows that Sandra Henley was called to the stand after the defense rested. She testified that she went to the hospital with another officer for the purpose of interviewing Mrs. Jordan. Henley testified that Florence was conscious when she talked to her in the X-ray room. Then, the following exchange occurred:
Q. What did she tell you?
BY MR. BOYCE HOLLEMAN: We object to that. That's not the proper way to do it.
BY THE COURT: Sustained. Ask the question, you ask the specific question on what you... .
Q. (Interposing) Did she tell you where she was standing in the room when Henry Paul Jordan... .
BY MR. BOYCE HOLLEMAN: (Interposing) We object to that. That's not proper.
BY THE COURT: Overruled.
Henley went on to testify that Florence told her that she was standing in front of the sofa when she was shot.

*581 Q. All right, sir. Did she tell you whether or not Henry Paul Jordan made any statements after she was shot?
A. Yes, sir.
Q. What statement did she make?
BY MR. BOYCE HOLLEMAN: Now, we object to that.
Q. I mean, what statement did he make?
BY MR. BOYCE HOLLEMAN: Now, wait just a minute. We object to this.
BY THE COURT: Overruled.
BY MR. BOYCE HOLLEMAN: We object to it on two grounds, one is that it's not the proper way to prove it. The second place, it's an effort to prove a statement by the Defendant made outside the presence of the Defendant, something he said.
BY THE COURT: I'll overrule it.
Compare this case to Murphy v. State, 453 So.2d 1290 (Miss. 1984), which also involved a general objection to hearsay testimony. There, Justice Sullivan wrote:
The contention that the testimony was improperly or untimely objected to is without merit. Defense counsel promptly objected. Conceding that he did not state his grounds of objection, it is obvious from the response of the prosecutor and the ruling of the trial judge, as well as the totality of the setting in which these objections were interposed, that everyone clearly understood that the objection was based upon the hearsay rule. There simply can be no doubt of that. In such circumstances it would be vain and foolish to demand that in the heated flow of trial, where the grounds of objection are reasonably apparent from the context, that counsel state his grounds or waive his objection.
Id. at 1293.
Using this rationale, we conclude that Jordan preserved his right to appeal the admissibility of the statements on grounds of hearsay and failure to lay a proper predicate.
Whether the ground of inter-spousal immunity was clear from the context of the objections is not as certain. However, even if Jordan had preserved the issue on appeal, there is no merit to the objection. We recognize the holding of Smith v. State, 193 Miss. 474, 478, 10 So.2d 352, 353 (1942) that, "If the wife could not have so testified personally and directly, she could not be made a witness nor the testimony made competent in this indirect and hearsay manner." However, in Smith, there was no indication that the wife was offered to testify, as Florence Jordan was here. Since we find that Florence Jordan testified voluntarily, this case is distinguishable from Smith.
The statements offered by Henley were hearsay. However, testimony is not hearsay if it is offered only to impeach the testimony of a witness, and not as substantive evidence. Moffett v. State, 456 So.2d 714, 719 (Miss. 1984). The jury was so instructed here. Florence's testimony on direct was that she did not remember giving a statement to anyone in the hospital. On cross-examination, she reiterated the lack of memory about the conversation. Where a witness neither admits nor denies a statement previously made, impeachment, in the form of testimony about the statement, is proper. Pool v. State, 483 So.2d 331, 337 (Miss.) cert. den Pool v. Mississippi, ___ U.S. ___, 106 S.Ct. 2280, 90 L.Ed.2d 722 (1986). The appellant also asserts, however, that, even if the statement was admissible as non-hearsay, the State failed to lay the proper predicate.
The questioning of Florence as to the statement to Henley occurred when she was describing the events which took place at the hospital the night of the shooting:
Q. Do you know Investigator Sandra Henley, with the Waveland Police Department?
A. No, sir, I don't.
Q. You don't remember having a conversation with her that night?
A. No, sir.
Q. Did she ask you where, did anybody ask you where you were standing, when you were shot?
A. Not that I know of. I don't remember.

*582 Q. Did anybody ask you whether or not, whether or not Paul, Henry Paul Jordan said anything when he came through the door? Did anybody ask you that question?
A. No, sir, not that I remember.
Q. You don't recall Sandra Henley asking you where you were standing, when you were shot?
A. No, sir.
Q. You don't recall telling Sandra Henley that after Paul shot you, he made the statement that Hargett was next?
A. No, sir.
"[I]n laying the predicate to introduce prior inconsistent statements of a witness, the questions should include whether or not on a specific date, at a specific place, and in the presence of specific persons, the witness made a particular statement." Carlisle v. State, 348 So.2d 765, 766 (Miss. 1977). See also Hubbard v. State, 437 So.2d 430 (Miss. 1983). This is exactly what the prosecutor did in this case. It was obvious from the tenor of the questions immediately preceeding this colloquy that the prosecutor had reference to a statement allegedly made in the hospital on the night of the shooting. Thus, the specific date and specific place requirements were met. The prosecutor also named the specific witness to the statement, and referred to its specific contents. Thus, the proper predicate was laid.
We, therefore, find no reason for reversal on this assignment of error. Since Florence Jordan testified voluntarily, she was subject to impeachment, and the admission of her prior statement was proper. The prosecution laid the requisite groundwork for the admission of Henley's testimony. Finally, any question of Jordan's mental or physical state at the time of questioning should go only to the weight of Henley's testimony, not to its admissibility.
Finding no reversible error in the trial of this case, we, therefore, affirm the conviction and sentence of Henry Paul Jordan.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
GRIFFIN, J., not participating.