## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-KA-01308-SCT

*OLLIE TEMPLE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/92 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE S. MONROE, II |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/1/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/22/96 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶**1.** This vehicular homicide case presents an evidentiary issue concerning admissibility of an interim digital display of alcoholic blood level by an intoxylizer when the test is not completed due to the failure of the defendant to blow long enough. We conclude that under the circumstances here presented the trial court cannot be found in error in admitting the evidence. We find no reversible error and affirm.

I.

¶2. Temple is charged with vehicular homicide while under the influence of intoxicating liquor. The case was tried by a jury which rendered a verdict of guilty on December 10, 1992. Temple appeals raising two issues:

> I. Whether testimony relating the digital readout of an intoxilyzer machine was admissible where the test was not completed due to Temple's failure to blow into the machine for a sufficient length of time; and

II. Whether the court erred in failing to grant a continuance where counsel was appointed eight days prior to trial and had two other trials scheduled in the interim.

## II.

¶3. Issue I presents an evidentiary issue of first impression. The statute under which he was charged requires proof of an injury or death as a result of the negligence of a driver while the driver was acting in violation of Miss. Code Ann. § 63-11-30 (1972). That section proscribes operating a motor vehicle under the influence of intoxicating liquor or with a blood alcohol content of .10 percent or greater. Temple was charged with being under the influence, not with a specific blood alcohol content. Nevertheless, testimony was elicited to the effect that the intoxilyzer machine registered .37 during an attempt to administer the test. The testimony from the test administrator and from one who checks the machines was to the effect that a failure to blow for four seconds will prevent the machine from printing out a completed test record. The person administering the test testified that Temple's indicated blood alcohol level continued to rise during the period that he blew into the machine and that meant that, had he continued to blow, he would have registered an even higher level. The machine tester was of the same opinion.

¶4. The court ruled that the evidence was admissible as relevant to the question of whether Temple was operating under the influence. That is, it was admissible to show that there was some blood alcohol content in aid of the conclusion that he was driving under the influence as charged. Miss. R. Evid. 401.

¶5. Temple relies upon *Gibson v. State*, 458 So. 2d 1046 (Miss. 1984) and *Johnston v. State*, 567 So. 2d 237 (Miss. 1988). In *Gibson* this Court reversed a manslaughter conviction because the blood sample kit used to produce blood alcohol evidence appeared to have an expiration date prior to its use in that case. 458 So. 2d at 1047. We observed that safeguards to insure the integrity of scientific evidence are generally strictly enforced. *Id.* It is not clear from the opinion as to how this evidence related to the charge. The statute in effect at the time of the incident created a rebuttable presumption of driving under the influence at a certain blood alcohol level. Miss. Code Ann. 1972 § 63-11-30 (Supp. 1983). In *Johnston* this Court reversed a driving under the influence conviction because of the use of test results from a machine not calibrated within the prescribed period. 567 So. 2d at 239. Again the opinion leaves it unclear whether Johnston was charged with driving under the influence or driving with a blood alcohol content level in excess of .10%, which by this time was a *per se* violation of the statute entitled "Driving Under the Influence." Miss. Code Ann. § 63-11-30 (Supp. 1987).

¶6. The State responds that the testimony concerning the machine was sufficient to support admitting the evidence and that there was sufficient additional evidence of driving under the influence. It is not clear whether this latter contention is one of harmless error.

¶7. The State cites *Estes v. State*, 605 So. 2d 772 (Miss. 1992) where, in the course of rejecting an attack on intoxilzyer evidence, this Court observed that there was other evidence of driving under the influence. In *Estes,* however, we found no deviation from prescribed procedures and the test was completed. One cannot say that the intoxilyzer evidence was harmless on this record. Not only did the prosecutor rely upon it heavily in closing, there is a dispute as to Temple's condition at the time from eyewitnesses.

¶8. All officers who dealt with Temple testified that he smelled strongly of alcohol, had slurred speech and walked in a wobbly manner. Temple gave a statement and testified that he had "had a few drinks" although he confined that to sharing a half pint with another and that some whisky remained in the half pint bottle. His car contained quite a few empty beer cans and one of the officers identified the smell of alcohol as beer related. To counter this testimony Temple showed that there was no indication from an eyewitness who passed him just before the accident that Temple was driving in any improper manner and two ambulance attendants who spoke to him smelled no alcohol and did not observe any slurred speech during their brief encounter. Temple leaned against a car during this encounter and they did not see him walk.

¶9. The contention that the evidence here complained of was admissible is based on the testimony of the officer administering the test and the officer who calibrated the machine, that the .37 reading was the minimum level that the printout would have shown had the test been completed. The machine was calibrated on August 3, 1990 and September 14, 1990 and shown to be working properly. Temple was tested on September 2, 1990. The officer who calibrated the machine testified that he was familiar with how they worked and that the failure to blow for four seconds would mean that the deep alveoli lung air was not reached. He opined that had Temple blown for a sufficient time the final reading would have been higher. There was no contradictory evidence. There was no testimony concerning the effect of the failure of the machine to indicate through its printout that it had been cleared of air prior to the test and cleared afterwards. Nor was there testimony concerning the significance of that fact.

¶10. The State also brings to our attention a similar case arising in Iowa. *State v. Wolfe*, 369 N. W. 2d 458 (Iowa App. 1985), and argues that there are critical faulty differences that distinguish that case. There, as here, the defendant failed to blow for the required time and there was no printout. Additionally, however, an officer also blew into the machine, presumably, in the words of the Iowa court, long enough for it to register, without success. Under those circumstances the admission of the interim digital indication was deemed error. The State distinguishes *Wolfe* as a case involving a demonstrably faulty machine.

¶11. What was before the court here was the testimony of one purporting to be an expert by training as to how the machine operated. He testified that the digital readout was an accurate measure of the alcohol content of the breath passing into the machine at the time and that continued blowing would have produced a higher result. In other words, while the interim digital reading was not an accurate indication of Temple's blood alcohol level it was in error only on the low side and .37 percent was the blood alcohol level at a minimum. We must acknowledge that, we are dealing with a machine and people trained to calibrate it and administer it whose credentials to verify its accuracy at some interim period may be questioned. It is, therefore, problematic to allow incomplete results where the machine's testing mechanism has not run its full course. Nevertheless, on this record, with no real attack on the credentials of the witnesses, or their experience in these circumstances, and no objection to their opinion testimony, the decision to admit the evidence will not be reversed.

## III.

¶12. Temple was not indicted for almost two years. When he was, he retained counsel and sought a continuance for one term, in August of 1992. At the beginning of the next term, the court realizing

that retained counsel had become incapacitated, appointed counsel for Temple. Temple demurred at first, but, after a day considering and perhaps seeking retained counsel, acquiesced in appointed counsel on December 1. The trial was scheduled for December 9. Appointed counsel, Mr. Monroe, had two other matters scheduled during the term, in the interim. At the hearing on the motion for continuance, the trial court noted that the incident had occurred more than two years before, that the defendant had contributed to delay by requesting a continuance at the former term, that some of the witnesses were quite elderly and that at least one of the matters that counsel had in the interim had settled, and ordered trial to proceed. Trial did proceed and counsel called a number of witnesses including the ambulance attendants and an accident reconstructionist who had originally been brought in by the State.

¶13. Here the State contends that no prejudice was shown. Temple does not suggest how he was prejudiced even though he protests that he had little time to interview the witnesses. He cites *Plummer v. State*, 472 So. 2d 358 (Miss. 1985). There, in route to finding that there was no prejudice and affirming, this Court questioned the wisdom and propriety of forcing a trial on a newly appointed lawyer on a Monday following a Thursday appointment in a rape case. While Temple cites the language used there he can take little comfort in the result. Here, as there, the rush to trial does not appear to have hindered an adequate presentation of the evidence. Temple suggests that had he had more time he could have supplied expert testimony refuting the intoxilyzer testimony. The record reflects no post-trial effort to demonstrate that such testimony is available.[1]

¶14. Temple raises no issue here concerning the sufficiency of the evidence. Clearly there was enough on the issue of intoxication. He stated that he was driving along on a clear day and all of a sudden he looked up and saw the deceased. An issue of improper lookout arises for jury resolution.

¶15. For the foregoing reasons the judgment of the trial court is affirmed.

¶16. **CONVICTION OF DUI MANSLAUGHTER AND SENTENCE OF NINE (9) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PRATHER, P.J., PITTMAN, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., AND McRAE, J.**

### SULLIVAN, PRESIDING JUSTICE, DISSENTING:

¶17. The majority's holding sets the precedent that a deficient intoxilyzer test can convict a person of vehicular homicide beyond a reasonable doubt. Thus, speculation as to what the defendant's blood alcohol *might* be is sufficient? This hardly amounts to guilty beyond a reasonable doubt.

¶18. The majority's holding, that it was not reversible error to allow the State to introduce evidence of the digital readout, is incorrect for three very important reasons. First, at the time the intoxilyzer test was taken, it was considered as having been refused and an invalid test. However, the State was allowed to introduce the evidence of this readout. Secondly, the majority states that since the defense made no real attack on the credentials of the witnesses, or their experience in these circumstances, and no objection to their opinion testimony, the decision to admit the evidence was not reversible;

however, the trial judge allowed the defense a continuous objection to any testimony regarding the reading. Third, Mississippi Code Annotated section 63-11-19 mandates that all analyses of a person's breath shall be performed according to approved methods. Those approved methods were not followed in this case.

¶19. The prosecution here had a choice as to what method they would use to prosecute Mr. Temple. The State chose to use the statutory read out of a test and then did not make its case. Of import is the fact that the operational checklist, filled out by the administering officer, stated on the top "refused test." If this were a breath test refusal, why then, was the State allowed to introduce the incomplete, insufficient, partial reading? The law enforcement witnesses admitted that the defendant refused the test; consequently, they should have treated it as such. For this very reason alone the test "results," for lack of better terminology, should not have been admitted into evidence.

¶20. The majority admits that it is problematic to allow incomplete results where the machine's testing mechanism has not run its full course. However, since there was "no real attack" on the credentials of the witnesses, or their experience in the circumstances, or objection to their opinion testimony, the decision to admit would not be reversed. However, a closer look at the transcript reveals that the defense had a continuous objection to testimony regarding the reading of the intoxilyzer; this certainly would encompass an objection to their opinion regarding the reading. The majority is correct that the defense did not "attack" the qualifications of the officers *to perform the test*. However, the defense did what is required to have his objection to any testimony regarding the reading reviewed by this Court. Mississippi Rules of Evidence, Rule 103(a)(1), states that a specific objection is not required if the specific ground for the objection was "apparent from the context." Specificity is not required where the grounds of the objection are reasonably apparent from the objection. *Peterson v. State*, 518 So. 2d 632, 635 (Miss. 1987); *Murphy v. State*, 453 So. 2d 1290, 1293-94 (Miss. 1984); *Jordan v. State*, 513 So. 2d 574, 580, 581 (Miss. 1987); *Barnette v. State*, 478 So. 2d 800, 802 (Miss. 1985); *Donald v. State*, 472 So. 2d 370, 372 (Miss. 1985); *House v. State*, 445 So. 2d 815, 819 (Miss. 1984). It is quite apparent that defense counsel was contesting the admissibility of any mention of the intoxilyzer. Thus, the majority's opinion that the defendant is procedurally barred is incorrect.

¶21. The majority's reasoning is faulty for a third reason. Section 63-11-19 of the Mississippi Code Annotated provides the following:

> Chemical analysis of the persons, breath, blood or urine, to be considered valid under the provisions of this section, *shall have been performed according to the methods approved by the State Crime Laboratory* created pursuant to Section 45-1-17 and the Commissioner of Public Safety . . . .

Miss. Code Ann. § 63-11-19 (emphasis added).

¶22. A basic tenet of statutory construction is that may is discretionary and the word shall is a *mandatory* directive. *Murphy v. State*, 253 Miss. 644, 649, 178 So. 2d 692, 693 (1965). Thus, section 63-11-19 of the Mississippi Code mandates that when taking a sample of a person's breath for determining alcohol concentration, an administering officer *must* use methods approved by the State Crime Laboratory and the Commissioner of Public Safety. A showing that these methods were followed is a foundational requirement for the test result's admission into evidence at trial.

¶23. The operational check list for the Intoxilyzer 4001A & 4011AS, as approved by the Mississippi Crime Laboratory and the Commissioner of Public Safety, has eighteen steps in which the administering official must follow before the test is deemed complete. Item number twelve, "Have the subject blow into the breath tube until the sample is complete," was not completed in this case, because no readout was ever obtained, thus the sample was **not** complete. Thus, the approved methods were not performed in this case.

¶24. The purpose served by these procedural requirements is the guarantee that the test results are sufficiently accurate for the use in judicial proceedings. *State v. Wolfe*, 369 N.W.2d 458, 459 (Iowa Ct. App. 1985). "These safeguards insure a more accurate result in the gathering of scientific evidence through intoxilyzers and are strictly enforced." *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990).

¶25. In the opinion, the majority distinguishes *Wolfe* because the facts are dissimilar, nevertheless the law in that case is applicable to this one. That court held, as do numerous other jurisdictions,[2] that "[i]n order to admit the results of a [breath] test into evidence, the State must demonstrate compliance with the procedural requirements, and the accuracy and reliability of the particular test results." *Id.* at 459.

¶26. "[M]ost jurisdictions . . . hold that compliance with the regulations governing blood-alcohol tests is foundational. The test result is not admissible unless compliance with these regulations is established." *State v. Bell*, 764 P.2d 113, 115 (Idaho Ct. App. 1988).

> A reading of the administrative rules with respect to the administration of Breathalyzer tests indicates that their purpose is to ensure the accuracy of those tests. Failure to meet any of the foundational requirements will preclude the use of the test results. [W]hen the administrative rules concerning the administration of the Breathalyzer tests have not been complied with, the accuracy of those tests is sufficiently questionable so as to preclude the test results from being admitted into evidence.

*People v. Tipolt*, 497 N.W.2d 198, 199 (Mich. Ct. App. 1993) (citations omitted).

¶27. "When the rules regarding . . . tests have not been complied with, the accuracy of those tests is considered sufficiently questionable so as to preclude the test results from being admitted into evidence." *People v. Broghner*, 531 N.W.2d 746, 747 (Mich. Ct. App. 1995) (citations omitted). Before "meeting foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of the Rules which have a direct bearing on the validity and accuracy of the test results." *State v. Souza*, 732 P.2d 253, 257 (Haw. Ct. App. 1987).

¶28. The "[i]ntroduction of a breath test lends the aura of scientific certainty to a prosecution for driving while intoxicated, often sealing the fate of the offender in the mind of the trier of fact. Thus, the detailed procedures to be followed reflect a determination that the test should be accurate and free from uncertainty as possible." *Bowman v. State*, 564 N.E.2d 309, 311 (Ind. Ct. App. 1990), *vacated in part on other grounds*, 577 N.E.2d 569 (Ind. 1991).

¶29. A Hawaii court of appeals stated it well when they said "We do not deem it unreasonable to

exact compliance with the laws and rules and regulations promulgated thereunder from those who enforce those laws." ***State v. Souza***, 732 P.2d 253, 258 (Haw. Ct. App. 1987).

¶30. Where a statutory prerequisite states that compliance is a requirement to admissibility of a test result there should be no question as to this effect of the failure to comply. Admission of such a result should not be allowed. Breath tests are based upon recognized scientific principles which if not followed directly affect the integrity of scientific evidence. When the court allows a test "result" in, it has a stamp of scientific approval. Compared with other evidence, a scientific test is by far the most forceful. It is not merely cumulative.

¶31. According to Larry Muse, an employee of the Department of Public Safety, if a defendant does not satisfy three conditions, the Intoxilyzer machine does not give a readout. These three conditions are blowing into the machine for four seconds, a breath lamp lighting up, and the readout leveling off. When these three conditions are met, according to an expert witness, a "true blood alcohol concentration reading" will be given. So, the question becomes what was the Intoxilyzer machine reading before the four seconds were up? The majority states that "[t]he officer who calibrated the machine testified that he was familiar with how they [the intoxilyzer] worked and that the failure to blow for four seconds would mean that the *deep alveoli lung air was not reached*." The majority states also that "an expert" "testified that the digital readout was an accurate measure of the alcohol content of the *breath passing the machine at the time . . . .*" So, the question again is what was measured? Deep lung air, as the experts testified, is an accurate measure of blood alcohol. Was the deep alveoli lung air reached, giving the actual blood alcohol level, or was it merely a reading of the mouth alcohol before the deep lung air was measured? These questions and more about the "results" were not addressed, making the integrity of this test sufficiently unreliable.

¶32. The majority states that there is dispute as to Temple's condition at the time from eye witnesses, namely the two ambulance attendants and the sister-in-law of the deceased, who saw Temple driving before the accident occurred. The reading of 0.37 is an unusually high reading. In the American Journal of Clinical Pathology, an article lists the stages of intoxication. For the readings of 0.27-0.40 the person is in a state of stupor. For the readings of 0.35-0.50 the person is in a coma. Dubowski, *Alcohol Determination in the Clinical Laboratory*, 74 Am. J. Clin. Path. 747, 749 (1980). So, the question again is how accurate was this reading?

¶33. The very purpose for the guidelines set out for the Intoxilyzer machine is so the tests will be reliable and the integrity of scientific evidence strictly enforced. There is nothing credible or reliable about this test. In fact the experts for the State testified that this "test" did not give a true blood alcohol reading. By allowing such inconclusive evidence to be used by the State the majority is now stating that mere speculation as to what a defendant's blood alcohol might be is sufficient to convict someone of an offense beyond a reasonable doubt. The State failed to meet its burden of proof to show that the deficiencies in the test procedures did not affect the accuracy of the test results and the majority is grievously wrong in so holding.

¶34. Although the majority cites ***Gibson v. State***, 458 So. 2d 1046, 1047 (Miss. 1984), and states that this Court "observed that safeguards to insure the integrity of scientific evidence are generally strictly enforced," the majority fails to follow this sound precedent. By allowing the State to introduce a flawed test "result" that did not meet procedural safeguards, the majority is making the

above quoted holding in *Gibson* obsolete, a dangerous precedent indeed.

¶35. In Mr. Temple's case the State did not follow the approved standards and thus the incomplete and partial readout should not have been admitted into evidence. Accordingly, I dissent.

**LEE, C.J., AND McRAE, J., JOIN THIS OPINION.**

1. Stephen M. Brent and Sharon P. Stiller, *Handling Drunk Driving Cases,* 169 (1985) indicates the verity of the testimony and suggests that an effort to find a contrary opinion would prove fruitless.

2. *People v. Broghner*, 531 N.W.2d 746, 747 (Mich. Ct. App. 1995)("Failure to meet the foundational requirements will preclude the use of the test results."); *State v. Crouch*, 638 N.E.2d 861, 864 (Ind. Ct. App. 1994)("Our courts have consistently held that the necessary foundation for admissibility of a breath test requires proof that the approved methods have been followed."); *State v. Zell*, 491 N.W.2d 196, 198 (Iowa Ct. App. 1992)("To establish the foundation for the introduction of breath test result, the State must prove the test was given using devices and methods approved by the Department of Public Safety."); *People v. Kilpatrick*, 576 N.E.2d 546, 550 (Ill. App. Ct. 1991) ("The results of chemical tests are admissible in criminal DUI prosecution only when there is compliance with . . . the Code and the regulations promulgated thereunder."); *State v. Grade*, 477 N.W.2d 315, 317 (Wis. Ct. App. 1991)(When the state fails to follow the chemical testing procedures enumerated in their rules, the test has not been completed and the partial test results will not be admissible.); *State v. Souza*, 732 P.2d 253, 257 (Haw. Ct. App. 1987)("[F]or the admission of the test result from the use of a particular Intoxilyzer utilized at a specific time, there must be sufficient foundational evidence showing that (1) the Intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered."); *State v. Fairleigh*, 490 So. 2d 490, 497 (La. Ct. App. 1986)(State has obligation of showing that it has strictly complied with all officially promulgated procedures to insure integrity and reliability of chemical test result).